UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 22-710 (MAS) |
| | : | |
| v. | : | 18 U.S.C. § 371 |
| | : | |
| WANG LIN, | : | |
| BI HONWEI, | : | |
| DONG TING, | : | |
| a/k/a "Chelsea Dong," and | : | |
| WANG QIANG | : | |

RECEIVED
OCT 20 2022
AT 2:37 p.m. M
WILLIAM T. WALSH
CLERK

Filed
10/20/2022
2:37 p.m.

INDICTMENT
(Conspiracy to Act in the United States as an
Illegal Agent of a Foreign Government)

The Grand Jury in and for the District of New Jersey, sitting at Trenton, charges:

### *Relevant Entities and Individuals*

1.  At times relevant to this Indictment:

    a.  The People's Republic of China ("PRC") was an internationally recognized foreign government listed in the Diplomatic List published by the United States Department of State. As such, the PRC was a "foreign government" as defined by Title 18, United States Code, Section 11.

    b.  The Ministry of State Security ("MSS") was a civilian intelligence agency in the PRC responsible for conducting counterintelligence and foreign intelligence activities, as well as political security for the PRC. The MSS consisted of a central ministry, provincial state security departments, and municipal state security bureaus. Among other things, the MSS and its regional

1

bureaus focused on identifying and influencing the foreign policy of other countries, including the United States. The MSS and its regional bureaus sought to obtain information on political, economic, and security policies that might affect the PRC, along with military, scientific, and technical information of value to the PRC. The MSS and its regional bureaus were tasked with conducting clandestine and covert human source operations, of which the United States was and remains a principal target.

      c.     The Institute for International Studies (the "IIS") was a purported academic institute ostensibly operating as a component of Ocean University of China, located in Qingdao, China, which MSS intelligence officers described in this Indictment used as a cover institution for their true clandestine intelligence activities. Despite their stated academic positions at the IIS, the MSS intelligence officers engaged in intelligence collection activities inconsistent with legitimate academic pursuits.

      d.     Defendant WANG LIN (hereafter, "WANG LIN") was a senior MSS intelligence officer who has acted for and on behalf of the PRC and the MSS since at least as early as late 1988. As cover for his affiliation with the MSS, WANG LIN purported to act as the Director of the IIS at Ocean University of China, but was not, in fact, an academic. Beginning as early as in or around 1997 and continuing through at least in or around 2018, WANG LIN, acting in his capacity as a PRC and MSS intelligence officer, directed individuals to act on behalf

2

of the PRC in the United States. In or around November 1999, WANG LIN traveled to the United States and visited a university in the United States.

      e.      Defendant BI HONGWEI ("BI") was an MSS intelligence officer who acted for and on behalf of the PRC and the MSS.

      f.      Defendant DONG TING, a/k/a "Chelsea Dong" ("DONG") was an MSS intelligence officer, employee, representative, and/or agent who acted for and on behalf of the PRC and the MSS. As cover for her affiliation with the MSS, DONG purported to act as a subordinate to WANG LIN employed by the IIS.

      g.      Defendant WANG QIANG ("WANG QIANG") was a citizen and national of the PRC and resided in or around Qingdao, China, and acted for and on behalf of the PRC and the MSS.

      h.      Co-Conspirator-1 ("CC-1") was a citizen and national of the PRC, was a lawful permanent resident of the United States, and resided in or around the District of New Jersey. As described in this Indictment, defendants WANG LIN and BI directed CC-1 to act in the United States as an agent of the PRC government.

      i.      Individual-1 was a former federal law enforcement officer and state homeland security official, and had extensive training and experience in counterterrorism, counterintelligence, and undercover matters. Individual-1 was employed as a professor at a national research university and focused on national and homeland security issues. As described in this Indictment, defendants WANG LIN, DONG, and other PRC agents attempted unsuccessfully to target Individual-1

3

for recruitment and/or to task Individual-1 to act in the United States as an agent of the PRC government.

2. At no time did any of the defendants, co-conspirators, or agents identified herein notify the Attorney General of the United States that they intended to act in the United States as agents of a foreign government or to direct such acts.

### *Overview of Chinese Intelligence Activities Targeting the United States*

3. The threat posed by the PRC's ongoing, wide-ranging, and systematic effort to collect intelligence information from United States sources, and to recruit agents for that purpose, has been well documented. The PRC conducts intelligence activities using a variety of sources, including through the MSS. Among other things, the MSS and its regional bureaus focus on identifying and influencing the foreign policy of other countries, including the United States. The MSS and its regional bureaus seek to obtain information on political, economic, and security policies that might affect the PRC, along with military, scientific, and technical information of value to the PRC. The MSS and its regional bureaus are tasked with conducting clandestine and covert human source operations, of which the United States is a principal target.

4. The PRC's intelligence program is multi-faceted. Relevant to this Indictment, one way that the PRC seeks to collect intelligence is through traditional espionage and agent/source recruitment. In this regard, Chinese intelligence and security services aggressively target current and former United States government

employees, facilities, and assets to gain access to United States government policies, plans, priorities, intentions, and capabilities for intelligence collection and compromise purposes.

5. The PRC's traditional targeting activities routinely seek to identify and assess (referred to as "spotting and assessing") sources of information with access to sensitive, non-public, and/or classified information belonging to United States government agencies, corporations, or universities. In that regard, Chinese intelligence agencies regularly attempt to spot and assess individuals associated with United States government and military agencies, as well as representatives of American corporations, businesses, and academic institutions. These efforts include identifying potential sources within the United States, as well as United States officials living abroad.

6. Chinese intelligence services use a variety of basic and sophisticated techniques—human, technical, and cyber-enabled—to pursue United States citizens as recruitment targets. To minimize the possibility of detection and legal action, PRC intelligence officers often conduct their activities from China, using recruited intermediaries (such as academics or businesspersons who travel to the United States) and online platforms—including social media and e-mail—to conduct their targeting activities. Chinese intelligence services utilize a variety of state ministries, societies, academic institutions, and the Chinese military-industrial complex to support intelligence activities, including by providing cover jobs to operatives. As described in this Indictment, the defendants used one such

purported academic institution—the IIS—as cover for their intelligence activities for the MSS.

7.   In order to accomplish their objectives of collecting intelligence information from targeted individuals in the United States, MSS intelligence officers often work through third parties—sometimes referred to as "cutouts" or "cooptees"—who are often located in the United States, and with whom the PRC intelligence agencies have a relationship of trust.  In this way, MSS intelligence officers can use United States-based agents to obtain intelligence information, without the need for their intelligence officers to risk traveling to the United States. In addition to more traditional efforts to collect information and recruit sources and agents from within the United States government, the MSS also poses a serious counterintelligence risk through the cultivation of sources and agents from within United States educational institutions.

### *The Conspiracy*

8.   From at least as early as 2008 and continuing through at least 2018, the defendants,

> WANG LIN,
> BI HONGWEI,
> DONG TING,
> a/k/a "Chelsea Dong," and
> WANG QIANG,

and others known and unknown, conspired and agreed with each other and others unlawfully to act in the United States as agents of a foreign government, namely, the PRC, without prior notification to the Attorney General of the United States, as

6

required by law, and to direct such unlawful action by others in the United States, contrary to Title 18, United States Code, Section 951(a).

### *Goal of the Conspiracy*

9. The goal of the conspiracy was for MSS intelligence officers—using the cover of a purported Chinese academic institute but operating on behalf of the MSS in fact—to identify, target, co-opt, and direct individuals to take action in the United States in a manner that would further the objectives of the MSS's intelligence mission, in order to benefit the interests of the PRC government.

### *Manner and Means of the Conspiracy*

10. It was part of the conspiracy that, in furtherance of the MSS's intelligence gathering objectives and the conspiracy charged in this Indictment, defendants WANG LIN, BI, DONG, and others known and unknown, acting for and on behalf of the MSS, systematically targeted individuals, including CC-1, Individual-1, and other United States persons inside and outside of the United States for recruitment, information, materials and equipment, and otherwise directed or "tasked" such individuals to act in the United States on behalf of the PRC. Set forth in paragraphs 11 through 22, below, are non-exclusive examples of the conspiracy's ongoing and systematic effort to target United States persons— under the guise of legitimate academic exchange—for the PRC's intelligence purposes and overall benefit.

## I. The Conspiracy's Targeting of Individual-1 to Act in the United States as an Agent of the PRC

11. It also was part of the conspiracy that between in or around 2008 and in or around 2018, WANG, LIN, DONG, and other MSS intelligence officers, acting under the cover of the IIS, a purported academic institution, and with the assistance of others, targeted Individual-1 for recruitment and/or to act in the United States as an agent of the PRC government.

12. It was part of the conspiracy that in or around 2008, and ostensibly on behalf of the IIS, WANG, LIN, DONG, and other PRC intelligence officers invited Individual-1 on an all-expenses-paid trip to China. The stated purpose for the trip was to have Individual-1 provide a security assessment for the 2008 Olympic Games in Beijing. During the trip—and notwithstanding their purported position as academics at the IIS—WANG, LIN, DONG, and others repeatedly requested Individual-1's assistance in procuring fingerprint technology and equipment from the United States, to include having it shipped to China.

13. It was part of the conspiracy that WANG, LIN, DONG, and other PRC intelligence officers also repeatedly pressed Individual-1 to take affirmative steps to stop planned protests in the United States along the Olympic torch route, which, according to WANG, LIN, DONG, and others, would be embarrassing to China. Individual-1 refused these requests.

14. It was part of the conspiracy that, years later, in or around 2018, WANG, LIN, DONG, and other PRC intelligence officers, again ostensibly on behalf of the IIS, invited Individual-1 to Qingdao, China for another series of meetings

purportedly related to security matters, in which WANG LIN, DONG, and others again participated.

15. It was part of the conspiracy that during the 2018 trip, WANG LIN paid Individual-1 approximately $7,000 in cash, purportedly in connection with Individual-1's consulting services.

16. It was part of the conspiracy that WANG LIN and other PRC intelligence officers also debriefed Individual-1 extensively over two days at a furnished condominium consistent with an intelligence safe house.

17. It was part of the conspiracy that during the trip, WANG LIN, DONG, and other PRC intelligence officers attempted to procure Individual-1's formal agreement to provide information and materials to the conspiracy for the benefit of the PRC government. To that end, during the trip, Individual-1 was presented with a proposed contract with a third-party Chinese company, which Individual-1 was asked to sign on the spot. Individual-1 refused to do so. According to a translated version of the company's brochure, the company's "core value" was the "national interest and national security" of China, and one of its objectives was to "protect the national interest and Chinese enterprises' overseas interest[s]." The brochure also indicated that the company intended to "build sources and channels to collect security information." In that regard, the proposed contract called for Individual-1 to provide consulting services and give lectures regarding security matters.

## II. The Conspiracy's Targeting of CC-1 to Act in the United States as an Agent of the PRC

18. It also was part of the conspiracy that in or around April 2016, defendants WANG LIN and BI tasked CC-1 and defendant WANG QIANG to act in the United States on behalf of the MSS and in furtherance of its intelligence activities, as described below.

19. It was part of the conspiracy that on or about April 11, 2016, CC-1, who was an acquaintance of WANG LIN, traveled from New York City to Nassau, Bahamas to meet with WANG LIN and BI, who had traveled to Cuba before proceeding to the Bahamas. Shortly after CC-1 landed in the Bahamas, CC-1 spoke multiple times to WANG LIN by telephone. Thereafter, while in the Bahamas, CC-1 had multiple in-person meetings with WANG LIN and BI, during which WANG LIN and BI directed CC-1 to return to the United States and (i) obtain $35,000, and (ii) provide it to a designated individual at a future date. WANG LIN and BI directed CC-1 to take this action in the United States for an unspecified purpose that would promote the MSS's intelligence activities and benefit the PRC.

20. It was part of the conspiracy that in or around May 2016, as WANG LIN and BI had instructed, CC-1 obtained $35,000 and provided it to a designated individual in or around Skillman, New Jersey.

21. It was part of the conspiracy that from on or about September 21, 2016 to on or about October 1, 2016, defendant WANG QIANG and two of CC-1's family members traveled together from the PRC to the United States on B2 non-immigrant

visas issued by the U.S. Department of State, and stayed with CC-1 at CC-1's residence in or around the District of New Jersey.

22. It was part of the conspiracy that during defendant WANG QIANG's visit to the United States, CC-1 and defendant WANG QIANG had multiple lawfully recorded conversations in which they discussed, in sum and substance and among other things, their activities on behalf of the PRC, as well as other operatives' clandestine activities on behalf of the PRC. Some of the statements made during these conversations, which were during and in furtherance of the conspiracy, are set forth below.

    a. On or about September 21, 2016, CC-1 had a conversation with WANG QIANG in the presence of at least one of CC-1's family members. During the conversation, which was lawfully recorded, they discussed, in sum and substance and among other things, the money that WANG QIANG and CC-1's family members had been carrying when they had entered the United States. WANG QIANG stated that he was not worried about the money that they had been carrying, but had been worried about the cellular telephones he had, as well as "the confidential stuff"—likely referring to information on the cellular telephones that WANG QIANG had brought into the United States.

    b. On or about September 22, 2016, CC-1 discussed with WANG QIANG and CC-1's two family members his trip to the Bahamas. During the conversation, which was lawfully recorded, CC-1 mentioned to his family members

that he had gone with a "classmate," referring to WANG LIN. CC-1 stated to WANG QIANG that they had "done much," and WANG QIANG agreed.

    c.    On or about September 30, 2016, WANG QIANG and CC-1 had a lengthy conversation. During the conversation, which was lawfully recorded, they discussed their activities and others' activities on behalf of the PRC. Relevant portions of WANG QIANG's and CC-1's conversation are summarized, in sum and substance, below:

    i.    WANG QIANG and CC-1 discussed that it was necessary to be cautious when working for the PRC inside of the United States, and that "there are a lot," referring to other individuals "who work for mainland China in the U.S." WANG QIANG noted that the PRC would deny any involvement if they (WANG QIANG and CC-1) were caught, and that they would be "abandoned." CC-1 agreed, and stated that PRC authorities would not assist them if they were caught. As an example, CC-1 and WANG QIANG discussed another individual whom, based on the context of the conversation, CC-1 and WANG QIANG believed had been abandoned by the Chinese government. According to WANG QIANG, that individual "mean[t] a lot to China." CC-1 agreed, stating that the individual "was kind of legendary," but s/he noted, in reference to CC-1 and WANG QIANG: that "little player like us . . . Who cares about you?"

    ii.    WANG and CC-1 continued to discuss working on behalf of the PRC and obtaining information for the PRC in furtherance of its intelligence-gathering operations. Among other things, CC-1 stated that s/he "like(s) to do it,"

meaning working for the PRC. CC-1 complained, however, that "[it] would be fine if there were more money." CC-1 continued, stating, "It will work if you can truly pull off something big, things like the fucking U.S. high tech, anything that is important, right?" CC-1 then stated that "We are the ones who do the fucking work." CC-1 also noted that "it is just a business," that "they pay you for each job done," and that "they will pay you again if they use you again."

        iii.        WANG QIANG and CC-1 continued to express fear about getting caught. Indeed, CC-1 stated that s/he did not "want to get into any trouble now." CC-1 advised WANG QIANG, "If you don't need to travel, it should be safe to stay in China. If you need to travel, fuck! The U.S. is very capable, I am telling you. You can't run away from them." CC-1 continued, "The Americans are really capable. Fuck! Two years or three years, screw you, they will get you when it's time. . . . On the other hand, I have no use to them if I go back. I have no use to them if I go back to China." During the conversation, WANG QIANG stated his belief that individuals working for the PRC "will be abandoned in the future."

        iv.        WANG QIANG and CC-1 also discussed another individual who they believed had been involved in collecting classified or other sensitive information in the United States on behalf of the PRC. WANG QIANG and CC-1 discussed whether the individual was collecting "intelligence," and if so, what kind of intelligence the individual was collecting. WANG QIANG and CC-1 discussed that the individual had been in the United States previously, but

subsequently had moved to another country. CC-1 then said that the individual's presence in the other country was "fine if [he/she] can get access to the secret stuff."

d. On or about October 4, 2016, CC-1 engaged in a conversation with CC-1's two family members. During the conversation, which was lawfully recorded, CC-1 discussed, in sum and substance and among other things, WANG QIANG's activities for the Chinese government. Among other things, CC-1 described WANG QIANG, as compared to his colleagues inside the PRC, as "just one running the errands." CC-1 explained that WANG QIANG would do what his colleagues inside of the PRC did not want to do. One of CC-1's family members asked whether WANG LIN and other Chinese intelligence personnel could get into the United States. CC-1 responded that they could not because they would "be detained as soon as they tried to get in." Finally, CC-1 told the individuals that WANG LIN and other intelligence officers may go to another country after they retire, but that the "Chinese won't let them out. The government won't allow them out until seven years after their retirement. Since most of the secrets in the administrative system are expired after seven years."

e. During the same conversation, CC-1 also discussed with CC-1's two family members, in sum and substance, what s/he believed to be the United States' surveillance capabilities. CC-1 also told her/his family members that WANG QIANG had expressed concern when he (WANG QIANG) entered the United States that customs officials had installed surveillance equipment on one of his telephones at the airport, and that WANG QIANG was concerned about numbers for several

14

contacts in North Korea that he had in his phones. CC-1 stated, in sum and substance, that WANG QIANG was "a low-level" official and should not have been concerned that he would be known to United States authorities.

### *Overt Acts*

23. In furtherance of the conspiracy and to effect its unlawful object, defendants WANG LIN, BI, DONG, WANG QIANG, and others committed and caused to be committed the following overt acts, among others, in Somerset County, in the District of New Jersey, and elsewhere:

    a. In or around 2008, WANG LIN, DONG, and others, acting under cover of a purported academic institution but operating on behalf of the MSS in fact, invited Individual-1 on an all-expenses-paid trip to China with the true purpose to (i) obtain Individual-1's assistance in procuring information and/or equipment that would be beneficial to PRC interests, and (ii) to obtain Individual-1's assistance in stopping planned First Amendment-protected activities in the United States that would be embarrassing to China.

    b. In or around March and April 2016, WANG QIANG coordinated travel plans and an in-person meeting between WANG LIN, BI, and CC-1 in the Bahamas.

    c. From on or about April 11, 2016 to on or about April 13, 2016, WANG LIN and BI met with CC-1 in the Bahamas and directed CC-1 to obtain $35,000 and provide it to another individual in furtherance of the MSS's intelligence-collection activities.

      d.      From on or about April 13, 2016 to on or about May 14, 2016, CC-1, acting pursuant to the directions given by WANG LIN and BI, obtained $35,0000 in cash, and obtained a receipt from the individual for having provided the individual the money.

      e.      On or about May 14, 2016, CC-1, acting pursuant to the directions given by WANG LIN and BI, provided $35,000 to another individual.

      f.      From on or about September 21, 2016 to on or about October 1, 2016, WANG QIANG traveled to the District of New Jersey to visit CC-1, during which time they discussed, among other things, actions taken in the United States on behalf of the PRC government, as well as the intelligence activities of, among other MSS intelligence officers, WANG LIN.

      g.      In or around 2018, WANG LIN, DONG, and others acting under cover of a purported academic institution but operating on behalf of the MSS in fact, invited Individual-1 on an all-expenses-paid trip to China with the true purpose to (i) obtain information from Individual-1 that would beneficial to PRC interests, and (ii) to execute a purported consulting contract between Individual-1 and a third-party Chinese company, whose "core value" was the "national interest and national security" of China.

      h.      In or around 2018, in connection with Individual-1's trip to China, WANG LIN paid Individual-1 approximately $7,000 in cash.

In violation of Title 18, United States Code, Section 371.

A TRUE BILL

███████████

FOREPERSON

*Philip R. Sellinger by A₂*

PHILIP R. SELLINGER
United States Attorney

CASE NUMBER: 22-710 (MAS)

# United States District Court
# District of New Jersey

UNITED STATES OF AMERICA

v.

WANG LIN,
BI HONGWEI,
DONG TING,
a/k/a "Chelsea Dong,"
WANG QIANG

## INDICTMENT FOR

18 U.S.C. § 371

PHILIP R. SELLINGER
*UNITED STATES ATTORNEY*
*NEWARK, NEW JERSEY*

J. BRENDAN DAY
JOYCE M. MALLIET
*ASSISTANT UNITED STATES ATTORNEYS*
*TRENTON, NEW JERSEY*